IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE HAWK, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMERICOLD LOGISTICS, LLC, | : | No. 02-3528 |
| Defendant. | : | |

**MEMORANDUM AND ORDER**

**Schiller, J.**                                                                                                   March    , 2003

Plaintiff Christine Hawk brought suit against her former employer, Americold Logistics, alleging sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act, discriminatory discharge in violation of the Pennsylvania Human Relations Act ("PHRA"), and defamation and intentional infliction of emotional distress under Pennsylvania common law. Presently before the Court is Defendant's Motion for Summary Judgment. Because I find that Plaintiff has set forth facts sufficient to create a genuine issue for trial on her Title VII and PHRA claims, and for the reasons set forth below, I deny Defendant's motion and will permit Plaintiff to proceed to trial on her Title VII and PHRA claims, except to the extent Plaintiff seeks punitive damages under the PHRA.

**I.      FACTUAL BACKGROUND**

Plaintiff Christine Hawk began working as a temporary employee making pallets at Defendant Americold Logistics in June, 1999. Ms. Hawk became an Americold employee, working as a forklift driver in the refrigerated facility, in December, 1999. (Hawk Dep. at 164, 171.) For the majority of her employment, Jack J. Bambary served as one of Ms. Hawk's direct supervisors. (*Id*. at 55, 198.)

Initially, Ms. Hawk and Mr. Bambary established a cordial friendship, but soon Mr. Bambary began to engage in harassing behavior. (*Id.*. at 105.) During her first month as a temporary employee, Mr. Bambary joined Ms. Hawk and another individual from work to watch a third co-worker and friend of Ms. Hawk, Robin Zelner, perform exotic dance at a club. (*Id.* at 50-52.) Mr. Bambary commented to Ms. Hawk that she would "look better up there dancing," to which Ms. Hawk replied that she was not a dancer. (*Id.* at 53.) Ms. Zelner gave Ms. Hawk's pager number to Mr. Bambary, who began to page Ms. Hawk every day. (*Id.* at 105-107.) Mr. Bambary began to call Ms. Hawk at home, as well, although she told him not to. (*Id.* at 113.) At one point, Mr. Bambary showed up unannounced at Ms. Hawk's home, explaining that he had seen her car while driving through the area. (*Id.*) On another occasion, Mr. Bambary came to Ms. Hawk's house when she was sick, explaining that he had come to check on her. She asked him to leave. (*Id.* at 121.) On yet another occasion, Mr. Bambary came to Ms. Hawk's home and began to recite his affections for her and refused to leave despite her requests that he do so. (*Id.* at 125.) A short time after Mr. Bambary's eventual departure, Ms. Hawk saw a flashlight in one of her windows. Ms. Hawk's sister then called the police. (*Id.* at 127.)

At work, Mr. Bambary frequently called Ms. Hawk into the dock office when she worked the Saturday shift. (*Id.* at 73.) Ms. Hawk would ask her co-worker, Melody Christ to accompany her when Mr. Bambary would make such requests. (*Id*, Christ Dep. at 9-10.) Ms. Hawk's co-workers, including Ms. Christ, Jose Cruz, Chad Distler and Jeremy Voss regularly observed that Mr. Bambary followed her and asked her about it. (*Id.* at 72, 76.) Mr. Bambary made a practice of interrupting conversations that Ms. Hawk had with male co-workers. (*Id.* at 76.) In particular, Mr. Bambary instructed Jeremy Voss not to talk to Ms. Hawk. (*Id.* at 78.) Mr. Bambary also regularly confronted Ms. Hawk about her conversations with male co-workers. (Hawk Dep. at 108.) Mr.

2

Bambary also sent Ms. Hawk suggestive messages on her forklift computer. (*Id*. at 115.)

Most seriously, Mr. Bambary frequently spoke to Ms. Hawk about her having sex with him and specifically told her he wanted her to have sex with him in his chair. (*Id*. at 85.) On one occasion, Mr. Bambary told Ms. Hawk to kiss him and grabbed her arm and tried to pull her toward him. (*Id*. at 85-86.) On another occasion, Mr. Bambary shoved Ms. Hawk up against a wall and asked her to have sex with him. (*Id*. at 87.)

Ms. Hawk rebuffed Mr. Bambary's requests for sex. (Hawk. Aff. ¶ 1.) At one point, Ms. Hawk told Mr. Bambary that if he did not leave her alone, she would call his wife. (Hawk Dep. at 74.) Ms. Hawk inquired of her co-worker, Kathy Cates, whether Mr Bambary had ever made comments of a sexual nature to her, and Ms. Cates indicated that he had. (*Id.* at 89, 90.) Mr. Bambary's harassment caused Ms. Hawk's productivity to decline at work. (*Id*. at 109-110.)

Ms. Hawk did not immediately report Mr. Bambary's behavior.[1] Ms. Hawk felt that Mr. Bambary "had control of the situation," (*Id.* at 115.) because he knew she could not leave her job because he was aware of her financial situation and of the fact that she had to raise her son by herself. (*Id*.) In August, 1999, Ms. Hawk told Eric Wilmont, a supervisor, that somone was harassing her but that she did not wish to discuss the matter further because she could handle it herself. (*Id*. at 68.) Mr. Wilmont and Ms. Hawk had no further conversation about the matter. (*Id*. at 72.) Finally, on March 3, 2000, after she left work, Ms. Hawk reported her allegations of sexual harassment to Sheila Persing, Americold's Human Resource Manager by telephone. (*Id*. at 222.)

---

[1] Americold maintains a Human Resources Guide and an Associate Handbook that set forth Defendant's Equal Employment Opportunity and Anti-Sexual Harassment policies. Americold also maintains a Code of Conduct that prohibits sexual harassment. Both Ms. Hawk and Mr. Bambary were made aware through various means of Defendant's sexual harassment policies. (Def's. Mem of Law at 4, 5.) Both attended sexual harassment training. (Hawk Dep. at 157, Persing Dep. at 26.)

That same day, Ms. Persing met with Mr. Bambary to discuss Ms. Hawk's allegations. Mr. Bambary denied the allegations of sexual harassment, but indicated that he and Ms. Hawk were friends. (Persing Dep. at 16, 19, 20.) On March 6, 2000, Ms. Hawk met with Ms. Persing and reported what had happened to her both verbally and in writing. (Hawk Dep. at 233.) Ms. Hawk asked to be permanently transferred to Americold's dry facility, which is about a mile from the refrigerated facility. (*Id*. at 241-42.) Ms. Persing informed Ms. Hawk that she and Mr. Bambary would be assigned to different shifts to minimize their contact. (*Id*. at 278-79.) At Ms. Persing's recommendation, Mr Bambary's shift was changed to minimize his contact with Ms. Hawk. (Persing Dep. at 28.) Ms. Persing conducted an investigation, interviewing individuals identified by Ms. Hawk and by Mr. Bambary. (*Id*. at 16.) On March 9, 2000, Plaintiff was temporarily transferred to Americold's dry facility, which is about a mile from the refrigerated facility. (Hawk Dep. at 242.)

On March 4, 2000, before Ms. Hawk began working in the dry facility, Pauline Ross, who would be Ms. Hawk's supervisor there, told Deborah Sandora, who would become a co-worker of Ms. Hawk, that Ms. Hawk was a "slut" and a "liar." (Sandorah Dep. at 57.) Ms. Ross also told Ms. Sandora that she had seen Ms. Hawk "hanging on" men in the refrigerated facility. (*Id*. at 57.) When Ms. Hawk began work in the dry facility on March 9, 2000, Ms. Sandora told Ms. Hawk what their supervisor, Ms. Ross, had said. (Hawk Dep. at 23.)

On March 13, 2000 Americold concluded its investigation. Ms. Persing concluded that Mr. Bambary had been unprofessional at times but had not sexually harassed Ms. Hawk. (Persing Dep. at 48-49.) The next day, Ms. Persing met with Ms. Hawk and informed her of her findings. Ms. Persing also indicated that Mr. Bambary was to have not contact with Ms. Hawk, would never be on the same shift, and would receive discipline. (*Id*. at 53,59.) Americold placed Mr. Bambary on a "Last Chance Agreement." (*Id*.) Ms. Persing gave Ms. Hawk the option of returning to work in

4

the refrigerated facility, to which Ms. Hawk agreed. (Persing Notes 3/14/00.) Ms. Hawk returned, however, only for one day, during which she had contact with Mr. Bambary. (Hawk Dep. at 327.)

On March 20, 2000, Plaintiff informed Ms. Persing by letter that she believed that she had been constructively discharged. (March 20, 2000 Hawk Letter.) Based on information contained in the letter, Ms. Persing conducted further interviews of Americold employees who were named in the letter. (Persing Dep. at 33, 35, 37, 39.) During those interviews, Ms. Persing heard from another female employee that Mr. Bambary had made comments to that employee that, in Ms. Persing's view, were not "appropriate." (*Id*. at 36-37.) On March 27, Americold terminated Mr. Bambary's employment, informed Ms. Hawk by letter that it had done so, and advised her that she could return to work at Americold. (*Id*. at 49, 65.) Subsequently, the United States. Equal Employment Opportunity Commission ("EEOC") conducted an investigation and, on March 8, 2002, issued a Probable Cause Determination in Plaintiff's favor and a right to sue letter. (EEOC Probable Cause Determination, Charge No. 170A10669, March 8, 2002.) On April 26, 2002, Plaintiff filed a four count complaint, alleging sex discrimination and sexual harrassment in violation of Title VII, discriminatory discharge of employment in violation of the Pennsylvania Human Relations Act ("PHRA"), defamation, and intentional infliction of emotional distress.[2]

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). In reviewing the record, "a court

---

[2] Plaintiff has withdrawn her claims for defamation and intentional infliction of emotional distress.

must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The moving party bears the burden of showing that the record reveals no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson*, 477 U.S. at 247. Once the moving party has met its burden, the non-moving party must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

A court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). Nonetheless, a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3rd Cir.1991). If the non-moving party's evidence "'is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted.'" *Gray v. York Newspapers*, 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting *Liberty Lobby*, 477 U.S. at 249-50).[3] The non-movant does not need to produce evidence

---

[3] Here, Plaintiff relies heavily on her own deposition testimony as evidentiary support for her opposition to summary judgment. As is shown below, however, her deposition testimony relates very specific, plausible material facts, not merely allegations. Moreover, as the Third Circuit has noted, "Title VII does not have a corroboration requirement." *Durham Life Insurance*

in a form that would be admissible in order to avoid summary judgment. *See Celotex*, 477 U.S. at 324. "As long as the evidence could be later presented in a form that would be admissible at trial – i.e. reducible to admissible form – it can be used to defeat summary judgment." *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).[4]

### III.   DISCUSSION

####   A.   Hostile Work Environment Sexual Harassment Under Title VII

It is well established that plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment. *Kunin v. Sears & Roebuck Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (*citing Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)). To prove a hostile work environment claim, a plaintiff must establish that (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Id.* (*citing Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)). Here, Defendant contends that Plaintiff cannot make out a genuine issue for trial on the second and fifth elements of her claim.

#####    1.   Severity and Pervasiveness of Discrimination

---

*v. Evans*, 166 F.3d 139, 147 (3d Cir. 1999).

[4] Here, Plaintiff relies on the EEOC Probable Cause Determination for evidentiary support in its opposition to summary judgment. As set forth below, however, I find that, independent of the EEOC determination, Plaintiff has proffered facts sufficient to survive summary judgment. Thus, I need not determine whether the EEOC document could be presented in a form that would be admissible at trial.

Defendant argues that the Plaintiff cannot show that the conduct complained of was sufficiently severe or pervasive. A hostile work environment claim should be examined in view of the totality of the circumstances. *West v. Philadelphia Elec. Co.*, 45 F. 3d 744, 756 (3d Cir. 1995); *Andrews*, 895 F.2d at 1485, and the court should consider (a) the frequency of the harassment, (b) its severity, (c) whether it is physically threatening or humiliating or merely an offensive utterance, (d) whether it unreasonably interferes with employee's work performance, and (e) its effect on an employee's psychological well being. *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993).

Ms. Hawk alleges that Mr. Bambary engaged in a pattern of sexual harassment over an eight month period. The facts, viewed in a light most favorable to Plaintiff, bear out this allegation. The harassment was frequent in that it occurred regularly at work in the form of unwelcome electronic and verbal communication of a sexual nature. The harassment also occurred "every day" in the form of unwelcome phone calls to Ms. Hawk's home and pager. The harassment was also severe at points. Mr. Bambary told Ms. Hawk he wanted to have sex with her in his chair, grabbed her and tried to pull her toward him, and shoved her up against a wall while indicating his desire to have sex with her. The frequency and severity of these occurrences coupled with the fact that Ms. Hawk felt that Mr. Bambary was "in control" of the situation because he knew she could not lose her job indicate that this behavior was humiliating. In addition, Ms. Hawk's coworkers frequently asked her about the fact that Mr. Bambary followed her around the workplace and interrupted her conversations with male employees. This too, is indicative of the humiliation cause by Mr. Bambary's behavior. This harassment negatively affected Ms. Hawk's productivity on the job and affected her emotionally. In his interview with Ms. Persing, Ms. Hawk's co-worker, Jose Cruz, indicated that Ms. Hawk became "very upset" when discussing Mr. Bambary's behavior. (Cruz Statement, March 10, 2000.) A jury could certainly find that this harassment would detrimentally effect a reasonable person in

the same position.

In *Keown v. Richfood Holding*, to which Defendant directs me, this Court granted summary judgment for the defendant on a sexual harassment claim. Civ A. No. 01-2156, U.S. Dist. LEXIS 10835, at * 22, 2002 WL 1340311, at *4 (E.D. Pa. 2002) (Schiller, J.). There, the plaintiff, a male, had received several pamphlets from coworkers relating to age and sexual function. *See Keown*, 2002 WL 1340311, at *4-5. The Court determined that although the pamphlets may have been offensive, they did not place him in a sexually threatening or humiliating position and that there was no reason why the pamphlets should have interfered with his work performance or had a significant impact on his psychological well being. *Id*. at *5. The Court also found that the pamphlets were sent too infrequently – eight or nine pamphlets in four months – to constitute harassment. *Id*. The alleged harassment in *Keown* does not begin to compare to that described here. Ms Hawk was daily subject to unwanted communication of a sexual nature, both at work and at home. Surely, such harassment must be viewed as severe and pervasive. I therefore find that Plaintiff has set forth facts sufficient to create a genuine issue for trial on the second element of her harassment claim.

## 2. Respondeat Superior Liability

Defendant also challenges Plaintiff's ability to show respondeat superior liability. In *Meritor Savings Bank v. Vinson*, the Supreme Court held that agency principles govern the liability analysis in hostile work environment sexual harassment cases. 477 U.S. 57, 72 (1986). Following *Meritor*, the Third Circuit has found that the RESTATEMENT (SECOND) OF AGENCY § 219 provides three bases for liability in such cases:

> Section 219(1) holds employers responsible for torts committed by their employees within the scope of their employment . . . Under § 219(2)(b), masters are liable for their own negligence or recklessness;

> in a harassment case, this is typically negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment. Finally, under § 219(2)(d), if the servant relied upon apparent authority or was aided by the agency relationship, the master is required to answer.

*Bouton v. BMW of N. America, Inc.*, 29 F.3d 103, 106 (3d Cir. 1994). Here, as noted, Mr. Bambary served as one of Ms. Hawk's direct supervisors. Following the Supreme Court's guidance *Faragher v. City of Boca Raton*, therefore, I will start with the § 219(2)(d) standard to determine whether Americold should be held liable for Mr. Bambary's conduct. 524 U.S. 775, 802 (1998), ("...[I]t makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and . . . the aided-by-agency-relation principle embodied in § 219(2)(d) provides an appropriate starting point . . ."). As the Supreme Court noted, the "agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior." *Faragher*, 524 U.S. at 803. This rationale is particularly apt here where, as noted, Ms. Hawk indicated that she feared she would lose her job if she reported Mr. Bambary's behavior. The Court has indicated the need for "active or affirmative" misuse of supervisory authority. *Id*. at 804.

There can be little doubt that a jury could find that Mr. Bambary actively misused his supervisory authority. For example, Mr. Bambary would regularly call Ms. Hawk to the dock office as a means of gaining access to her. Mr. Bambary would also used his authority to prevent Ms. Hawk from engaging in conversation with male coworkers. In the context of Mr. Bambary's other harassing behavior, such explicit use of authority constitutes misuse. I therefore find that the Plaintiff can make out a genuine issue for trial as to Defendant's liability.

      **a.**      **Affirmative Defense Under *Faragher* and *Ellerth***

Under a doctrine that has come to be known as the *Ellerth/Faragher* affirmative defense, an employer that has taken no tangible adverse employment action against an employee cannot be held liable for the creation of a hostile work environment by that employee's supervisor if certain conditions are manifest. As explained by the Supreme Court:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise . . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *see also Faragher*, 524 U.S. at 807-08 (1998).

Here, Plaintiff contends that Defendant took tangible employment action towards her in the form of a constructive discharge. The Supreme Court has defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. Other courts have split on the question of whether a constructive discharge constitutes a tangible adverse employment action. *Compare Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir. 1999) (holding that "constructive discharge does not constitute a 'tangible employment action' as that term is used in *Ellerth* and *Faragher*") *with Cherry v. Menard,*

*Inc.*, 101 F. Supp. 2d 1160, 1171-75 (N.D. Iowa 2000) (explicitly disagreeing with the conclusion reached by the *Caridad* court). The Third Circuit has not definitively resolved this issue, but has suggested that it might recognize constructive discharge as a tangible employment action. *See Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 153 (3d Cir. 1999) (rejecting a theory under which any substantial adverse action would not be tangible adverse action if it led affected employee to quit before demotion took effect as "contrary to Title VII doctrine," which "recognizes a constructive discharge under such circumstances,").[5]

In *Cardenas v. Massey*, 269 F.3d 251, 266 n.10 (3d Cir. 2001) the court reserved this question for resolution in the first instance by a district court but assumed that a constructive discharge could operate as a tangible employment action. Proceeding from that assumption, the court determined that if the plaintiff could convince the jury that he was victimized by a hostile work environment, "it is certainly possible that the same jury would find that the hostile environment was severe enough to have precipitated [plaintiff's] resignation, i.e., a constructive discharge." *Cardenas*, 269 F.3d at 266-67. The court subsequently found that the plaintiff had presented sufficient evidence to create a question of fact as to the existence of a hostile work environment and, accordingly, found that plaintiff could survive summary judgment on the constructive discharge issue. *Id*. at 267. Here, as noted, Plaintiff has presented sufficient evidence to create a question of fact as to the existence of a hostile work environment.

Assuming arguendo that she had not, Plaintiff can show constructive discharge. Sex

---

[5] Plaintiff contends that *Goldberg v. City of Philadelphia*, 1994 WL 313030, at *6 (E.D. Pa. 1994), may be read to support the proposition that "a constructive discharge action may be based on a hostile work environment claim." I cannot agree. The *Goldberg* court held that a plaintiff public employee who had shown that defendants made his working conditions so intolerable that a reasonable employee would have been forced to resign could survive summary judgment on his *procedural due process* claim. *See id.*

discrimination results in constructive discharge if "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 28 (3d Cir. 1997) (*quoting Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887-888 (3d Cir. 1984)). Defendant contends that Plaintiff was not terminated or demoted and that she "voluntarily" made the decision to resign her employment. Defendant cites no portion of the record which supports its assertion of voluntariness. Plaintiff can point to several facts in the record that support the opposite conclusion. As noted, before Ms. Hawk began working in the dry facility, Pauline Ross, a supervisor there, told Deborah Sandora, who would become a co-worker of Ms. Hawk, that Ms. Hawk was a "slut" and a "liar" and that she had seen Ms. Hawk "hanging on" men in the refrigerated facility. When Ms. Hawk began work in the dry facility on March 9, 2000, Ms. Sandora told Ms. Hawk what their supervisor, Ms. Ross, had said. The record shows at least a factual dispute over whether Ms Hawk was ever given the option of a permanent position in the dry facility. As noted, when Ms. Hawk returned to the refrigerated facility, she encountered Mr. Bambary. Where a victim of harassment is required to work in close proximity to the alleged harasser, it adds to the hostility of her environment. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 717 (3d Cir.1997) (assignment to work in close proximity to harassers is significant factor in totality of circumstances inquiry).

     Because Plaintiff has made out a genuine issue of material fact as to the existence of hostile work environment, and has independently demonstrated the existence of a genuine issue of fact as to whether any reasonable woman in her position would have resigned, I conclude that Plaintiff has sufficiently shown that she suffered a tangible employment action, so as to preclude application of the *Faragher/Ellerth* affirmative defense. Because the existence or nonexistence of a tangible

employment action is an issue of fact for the jury, however, I will examine whether the affirmative defense might afford Defendant summary judgment. See Durham, 166 F. 3d at 149, n.5. (Discussing appropriateness of examining *Faragher/Ellerth* affirmative defense where constructive discharge created tangible employment action.)

### 1.     Defendant's Exercise of Reasonable Care

To satisfy the first prong of the affirmative defense, Defendant must show that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. *Ellerth*, 524 U.S. at 765. Defendant had a detailed, well-developed and well-publicized anti-sexual harassment policy. Both Ms. Hawk and Mr. Bambary attended Defendant's sexual harassment training. Ms Persing promptly commenced an investigation into Ms. Hawk's claims and temporarily transferred Ms. Hawk to a facility where she would not encounter Mr. Bambary. Defendant's March 13, 2000 report concluding its investigation into Ms. Hawk's claims states:

> Mr. Bambary was put on a last chance agreement, ordered to contact the EAP program and follow up with any counseling that was deemed appropriate. Mr. Bambary was also instructed not to have any contact with Ms. Hawk in or outside of work. Mr. Bambary was transferred to another shift where he would have no personal or professional contact with Ms. Hawk.

(Americold Investigation Report, March 13, 2000.) Yet Plaintiff can point to evidence in the record that could create a genuine issue of material fact as to whether Defendant's actions meet the "reasonable care" standard. The deposition testimony of John Wilmont, who also supervised Ms. Hawk at Americold, testified that Ms. Persing told him that Americold was trying to "keep . . . quiet" Ms. Hawk's harassment claim. (Wilmont. Dep at 40-41.)  At her meeting with Ms. Hawk, Ms Persing said "I should not say this, but Jack has has been known to talk like this to women, that's just the way Jack is." Ms. Persing also asked Ms. Hawk if she "realize[d] Jack has a wife and kids

this can affect."(Hawk Dep. at 244.) The record also appears to show that Ms Hawk was never given the option of a permanent position in the dry facility. As noted, when Ms. Hawk returned to the refrigerated facility, she encountered Mr. Bambary. Where a victim of harassment is required to work in close proximity to the alleged harasser, it adds to the hostility of her environment. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 717 (3d Cir.1997) (assignment to work in close proximity to harassers is significant factor in totality of circumstances inquiry). Mr. Bambary was ultimately terminated, but not before Plaintiff had indicated her belief that she had been constructively discharged.

Moreover, both supervisors Wilmont and Cimino had information that arguably should have been brought to the attention of superiors. Ms. Hawk expressly told Mr. Wilmont that someone was harassing her and Mr. Cimino overheard Ms. Hawk say to Mr. Bambary "you can't talk to me that way." Neither supervisor took steps to follow up or report this information. These facts alone suffice to create a genuine issue of fact as to the first prong of the affirmative defense.

### 2. Plaintiff's Failure to Use Preventive or Corrective Opportunities

To satisfy the second prong of the affirmative defense, Defendant must show that Ms. Hawk unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth*, 524 U.S. at 765. Ms. Hawk was far from prompt in bringing Mr. Bambary's harassment to the attention of the appropriate authorities at Americold. Further, Ms. Hawk's description of the Mr. Bambary's behavior was not detailed and her initial list of witnesses was limited. Indeed, where the alleged harassment began as early as June or July, 1999, Ms. Hawk did not take formal action until March of 2000. Ms. Hawk had attended anti-harassment training and was aware of Americold's anti-harassment policy.

In *Matavia v. Bald Head Island Management*, the Fourth Circuit found that an employee who

waited three months to report sexual harassment had acted unreasonably. 259 F.3d 261, 273 (4th Cir. 2001). There, the employee explained that her delay in reporting the harassment stemmed from a desire to gather evidence and a fear of social retaliation by co-workers. *Matavia*, 259 F.3d at 270. Here, Ms. Hawk explained that her delay stemmed from a fear that she would lose her job. Ms. Hawk was a temporary employee when the harassment began. Both she and Mr. Bambary knew the importance her job held for her. Mr. Bambary had direct supervisory authority over her. Ms. Hawk's explanation of her delay comports with her August, 1999 statement to Mr. Wilmont that someone, whom she refused to identify, was harassing her.

Defendant also argues that Plaintiff behaved unreasonably because she did not "provide Americold with all relevant information at the start of its investigation," and thereby deprived Defendant of an opportunity to properly investigate and remedy the harassment. (Def.'s Mem. of Law at 41.) In *Sicalides v. Pathmark Stores, Inc.*, the court found that the plaintiff had unreasonably obstructed the defendant employer's efforts to investigate and remedy the situation. Civ A. No. 99-3465, 2000 U.S. Dist. LEXIS 8051, at *27 (E.D.Pa. June 12, 2000). There, the employer first received notice of the problem through the plaintiff's filing of a claim with the EEOC. The plaintiff also refused to meet with her employer despite its efforts to secure a meeting. *Sicalides*, 2000 U.S. Dist. LEXIS 8051, at *26-27. Here, Ms. Persing's notes from her March 3, 2000 phone conversation with Ms. Hawk, however, suggest that Ms. Hawk identified her harasser and provided detailed examples of the harassing behavior. (Persing Notes, March 3, 2000.) At least one witness identified by Ms. Hawk during that conversation, Jose Cruz, told Ms. Persing that Ms. Hawk had told him about Mr. Bambary's requests for sex and about Mr. Bambary pushing Ms. Hawk against the wall. (*Id.*, Cruz Statement, March 10, 2000.) This does not approach the sort of obstruction encountered by the Fourth Circuit in *Sicalides*. I therefore find that a jury could find that Ms. Hawk did not

16

unreasonably fail to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

### b. Defendant's Remedial Action

Relying on *Bouton* and *Kunin*, Defendant asserts that, separate and apart from the *Faragher/Ellerth* analysis, it cannot be held liable for alleged hostile work environment sexual harassment because it maintained an effective anti-harassment policy, engaged in a prompt investigation, and took effective remedial measures in response to Plaintiff's complaint. As a matter of law, Defendant's contention is misplaced.

In *Bouton*, decided four years before *Faragher* and *Ellerth*, the court analysed the applicability of each of the three aforementioned bases of agency liability from the Restatement. There, the court wrote:

> In sum, we hold that an effective grievance procedure – one that is known to the victim and timely stops the harassment – shields the employer from Title VII liability for a hostile environment. By definition there is no negligence if the procedure is effective. A policy known to potential victims also eradicates apparent authority the harasser might otherwise possess.

29 F.3d at 110. In *Kunin*, which was decided after *Faragher* and *Ellerth* but involved harassment by a non-supervisory co-worker, the court, relying on *Bouton*, found that "when an employer's response stops harassment, there cannot be Title VII liability." 175 F.3d at 294. The *Kunin* court, however, applied only the negligence theory of agency to the case. *See id.* ("Sears will be liable to Kunin only if she can establish that Sears had notice of harassment. . . and yet failed to take adequate steps to stop it"). Citing to these respective portions of *Bouton* and *Kunin*, Defendant argues that its policy, investigation and remedial measures necessarily shield it from liability. (Def.'s Mem. of Law at 42-43.)

*Faragher* does not contemplate the assertion of a defense separate and apart from the

17

affirmative defense it provides. The first prong of the affirmative defense, namely that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior,"524 U.S. at 807-08, must supercede the analysis in *Bouton* permitting "a policy known to potential victims" to "eradicate[]" apparent authority. 29 F.3d at 110. The negligence theory of liability under § 219(2)(b), moreover, is not at work in this case.

More importantly, as noted, an employer may succeed on a *Faragher/Ellerth* affirmative defense only where no tangible employment action has been taken and where both prongs of the defense are separately satisfied. I thus decline Defendant's invitation to permit an end run around the *Faragher/Ellerth* analysis that governs this case, and will dispose of the respondeat superior issue according to the analysis above.

B.   **Gender Discrimination Under PHRA**

Discrimination claims brought under the PHRA are generally governed by the same standard of proof as those governed by Title VII. *See Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996.) The Supreme Court has recognized that hostile work environment sexual harassment violates Title VII's prohibition of discrimination based on sex. *See Farragher*, 524 U.S. at 786. I have already found that Plaintiff has put forth facts sufficient to survive summary judgment on her Title VII claim. In so doing, I have found that Plaintiff has put forth facts sufficient to generate an issue for trial as to whether she was constructively discharged. Thus, I will also find that Plaintiff survives summary judgment on her PHRA claim.

C.   **Punitive Damages Under Title VII**

A Title VII Plaintiff may obtain a punitive damage award where it can show that an

employer acted with "malice or reckless indifference to the federally protected rights of an individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). It is true that Americold, through the establishment and dissemination of anti-harassment policy and its prompt response to Ms. Hawk's allegations, made a good faith effort to comply with the governing law. Yet there is evidence in the record that suggests the possibility of reckless indifference. Accordingly, I will hold Defendant's motion to dismiss Plaintiff's claim for punitive damages under Title VII in abeyance for ruling at trial.

### D. Punitive Damages Under the PHRA

There is no right to punitive damages under the PHRA. *See Hoy v. Angelone*, 554 Pa. 134, 142 (1998). Accordingly, I grant Defendant's motion with respect to Plaintiff's claims for punitive damages under the PHRA.

### IV. CONCLUSION

For the foregoing reasons, I deny Defendant's motion for summary judgment as to Plaintiff's Title VII and PHRA claims. I hold in abeyance Defendant's motion to dismiss Plaintiff's punitive damage claim for resolution at trial. I grant Defendant's motion with respect to Plaintiff's claims for punitive damages under the PHRA.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**CHRISTINE HAWK,** :
      **Plaintiff,** : **CIVIL ACTION**
  :
**v.** :
  :
**AMERICOLD LOGISTICS, LLC,** : No. 02-3528
      **Defendant.** :

### ORDER

**AND NOW**, this     day of March, 2003, upon consideration of Defendant's Motion for Summary Judgment, and the response thereto, and for the foregoing reasons, it is hereby **ORDERED** that:

1. Defendant's Motion for Sumary Judgment is GRANTED IN PART AND DENIED IN PART as follows:

    a. Defendant's motion is granted only with respect to Plaintiff's claim for punitive damages under the PHRA.

    b. A ruling on Defendant's motion with respect to punitive damages under Title VII shall be held in abeyance for resolution at trial.

    c. Defendant's motion is denied in all other respects.

2. By agreement of the parties, Plaintiff's claims for defamation and intentional infliction of emotional distress are withdrawn.

**BY THE COURT:**

_____
**Berle M. Schiller, J.**